UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
ZAREPTA CHEMICAL, K.S. As Owners
of the M/T RACHEL B and HILTVEIT

                      Petitioners,

05 CV 8265 (CLB)

      - against -

***Memorandum and Order***

SOLAE, LLC,

                      Respondent.
------------------------------------------------------x

Brieant, J.

       By motion filed in this admiralty case controlled by Federal law, on September 26, 2005, heard and fully submitted on October 6, 2005, Petitioners Zarepta Chemical K.S. ("Zarepta") as current Owner of the M/T RACHEL B (the "Vessel") and Hiltveit Associates ("Hiltveit") collectively ("Petitioners") move pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201; Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"); and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, T.I.A.S. No. 6997, 330 U.N.T.S. (1970), implemented by 9 U.S.C. § 201 et. seq. ("Convention") for a preliminary and final injunction enjoining a maritime arbitration as against them. Respondent, Solae, LLC ("Solae") filed opposition papers to this motion on September 29, 2005. Reply papers were filed on October 6, 2005.

       The following facts were developed at the Rule 65 hearing. This is an action to enjoin arbitration for claims arising from a maritime dispute. Respondent seeks to recover cargo loss and damage incurred as a result of contamination of a bulk cargo of

1

lecithin carried in two separate voyages from Jacksonville to Rotterdam by the M/T Rachel B ("the Vessel"). The sole issue is whether Petitioners are required to arbitrate.

*Parties*

Petitioner Zarepta Chemical K.S. (Zarepta) is a Norwegian business organization which acquired ownership of the Rachel B after the events giving rise to the claims sought to be arbitrated. Petitioner Hiltveit Associates (Hiltveit) is a New York corporation which was the managing agent for Suffolk Tankers Ltd. ("Suffolk"), the former owner of the Rachel B, as well as for Zarepta. It was the signatory of a Contract of Affreightment (COA) discussed below. Suffolk was a one-ship corporation formerly existing under Liberian law, and is not a party to these proceedings.

Respondent Solae LLC (Solae) has its principal office in St. Louis, Missouri, and is the successor in interest to Central Soya Company Inc., ("Central Soya US") and Central Soya European Lecithins GmbH & Co. KG of Hamburg, Germany ("Central Soya Europe"). Central Soya Europe was the consignee of the shipments and Central Soya USA was the shipper and a party to the COA.

After protracted negotiations in early December of 2001, Hiltveit, describing itself as "managing agents to owners" executed the COA for the carriage of Central Soya US's Lecithin cargo from Jacksonville to Rotterdam, calling for three liftings on vessels to be named. The lecithin was to be used in the production of pharmaceutical products.

2

The COA (Ex. B to the Petition) was dated December 20, 2001. The COA incorporated and attached the standard form of Tanker Voyage Charter Party "ASBATANKVOY". Under the COA, Par. 10, Hiltveit was to nominate a performing vessel for each voyage. Hiltveit as agent for owners was free to nominate any vessel; Central Soya US had the right to confirm or reject a nomination.

> Part II of ASBATANKVOY provides at paragraph 24 in relevant part that:
>
> Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York. . . pursuant to the laws relating to arbitration there in force"

On or about January 15, 2002, the Rachel B was nominated by Hiltveit to perform the first lifting. Central Soya US accepted this nomination on January 25, 2002. On or about January 29, 2002, the Rachel B arrived at Jacksonville, Florida and lifted the first cargo for carriage under the COA. A clean Bill of Lading was issued on January 29, 2005 stating that the shipment was carried under and pursuant to the terms of the COA dated December 20, 2001. The Vessel discharged the cargo in Rotterdam in March, 2002.

Thereafter, on April 15, 2002, after the first shipment on the Rachel B and another shipment under the COA on a different vessel, Hiltveit nominated the Rachel B for a third voyage. Lecithin was again carried to Rotterdam by the Rachel B, pursuant to a clean Bill of Lading issued on or about May 7, 2002.

The Bills of Lading (Exhibits C and D) were issued to Central Soya US with Central Soya European Lecithins GMBH & Co. (Central Soya Europe) as consignee, and recited that the shipment "is carried under and pursuant to the terms of the COA dated December 20, 2001 at New York, New York between Suffolk Tankers Ltd., with Hiltveit Associates, Inc., as agents to owners, and Central Soya Company."

Respondent claims that the lecithin on each voyage became contaminated with benzene while on board the Rachel B. Because of this contamination, the lecithin became unfit for its intended pharmaceutical purpose and had to be sold at reduced prices. Lost profits and expenses in connection with salvage sales are claimed.

On October 29, 2002 arbitration was demanded by Central Soya US against Suffolk and Hiltveit. Hiltveit and Suffolk jointly appointed an arbitrator in response to the demand. Solae's counsel submitted to the arbitrators a pre-hearing memorandum dated May 25, 2005 identifying Solae as successor in interest and purported to add the Vessel *in rem* to the arbitration. Exhibit E requested a P & I Club Letter of Undertaking "to avoid the complications of arrest, etc." However, no such letter was ever furnished and the Rachel B was never arrested, and no explanation given for failing to have done so.

After a preliminary hearing before the arbitration panel on July 29, 2005, Petitioners' counsel wrote to the arbitration panel stating Hiltveit and the Vessel are not

proper parties to the arbitration and that a Court must decide the issue. Arbitration hearings are presently scheduled with the panel on November 14, 15, and 16, 2005.

This Court has subject matter jurisdiction under 28 U.S.C. § 1331, § 1332, and § 1333. The Petition also involves 9 U.S.C. § 1 et. Seq. and 9 U.S.C. § 206 and the Declaratory Judgment Act, 28 U.S.C. § 2201. The Court has personal jurisdiction over the Respondent.

"Arbitration is a matter of consent, not coercion." *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (*quoting Volt Information Sciences v. Board of Trs*., 489 U.S. 468, 479 (1989)). A party "cannot be required to submit to arbitration any dispute which he has not agreed to submit." *See Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83-84 (2002) (*quoting Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582 (1960)).

Notwithstanding the "long recognized 'liberal federal policy favoring arbitration agreements,' *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24-5 (1983), whether the parties have agreed to submit a particular dispute to arbitration, that is, the 'question of arbitrability,' is an issue for judicial determination [u]nless the parties clearly and unmistakable provide otherwise." *AT&T Technologies, Inc. Communications Workers*, 475 U.S. 643, 649 (1986). Under 9 U.S.C. § 4, the proper procedure for a party to challenge whether it is subject to an arbitration agreement is to move the District Court to enjoin arbitration. *Smiga v. Dean Witter Reynolds, Inc.*, 766

F.2d 698 (2d. Cir. 1985). A person against whom an arbitration has been initiated, who has not agreed to arbitrate, directly or by operation of law, is deemed to be irreparably damaged.

>Our Court of Appeals has held:
>
>>First, [the district court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration. *Oldroyd v. Elmira Sav. Bank*, FSB, 134 F.3d 72, 75-76 (2d Cir. 1998).

There is no question that Solae may arbitrate against Suffolk. Counsel do not suggest otherwise and there is no appearance in this action by Suffolk. Solae contends that Suffolk was a one ship corporation which is now a no ship corporation, and presumably defunct and dissolved. It claims that the corporation had no officers, directors, or corporate reality and that it can pierce the corporate veil. This may well be true on the facts presented. However, the Court expresses no opinion as to that. It may well be that an arbitral award leading to an entry of a judgment for money damages against Suffolk returned unsatisfied could result in future litigation against the real parties in interest including Suffolk's principals possibly including Hiltveit. The fact remains that the record here will not support a judicial finding of an agreement on the part of Zarepta or Hiltveit Associates to arbitrate.

*Arbitration against Hiltveit Associates*

From the beginning of the negotiations and in all documents signed by Hiltveit, it was referred to as "managing agent to owners." We assume for our analysis that when the COA was signed in December 2001, the identity of the owners was not known to Solae's predecessors. It was known that an agency existed. However, by the time the bills of lading were issued for the cargos of lecithin claimed to have been damaged, the principal, Suffolk, was fully disclosed. That the owners had the right to substitute a vessel for the RACHEL B, which they never did, does not alter the fact that by the time the RACHEL B and its owners became obligated to perform the contract of carriage, Suffolk was a fully disclosed principal.

An instructive case is *In Re Hidrocarburos y Derivados, C.A.* v. *Lemos*, 453 F. Supp. 160 (S.D.N.Y., 1977). *Hydrocarburos* involved the obverse situation of this case, in that the charterers sought to compel the owner of the vessels to arbitrate under a contract of affreightment. In that case as here, agents had signed the COA as agents for a partially disclosed principal but the owners whose vessels were used for the actual carriage became disclosed principals at the time of nomination.

Judge Haight held:

> However, once Nereus [the agent] nominated a vessel to load a cargo pursuant to Clause 3 of the COA, her corporate owner became known. While it is generally said that the pertinent knowledge of a principal's existence or identity is that which exists at the time of the transaction so that subsequent 'disclosure' has no bearing upon the relationship created at the time of the transaction, Restatement § 4, Comment c,

7

> the rule is usually applied to simple contracts (see illustrations to the Comment); in the rather unusual circumstances of the contract at bar, I hold that corporate shipowners whose vessels were actually nominated became disclosed principals, to the extent of that particular voyage at the time of nomination."

Judge Haight concluded that the petition to compel arbitration should be granted "as to those corporate shipowners whose vessels performed voyages giving rise to the claims which are pending in arbitration". Relying on *Hydrocarburos,* this Court concludes that Hiltveit Associates may not be compelled to arbitrate for the reason that its principal was not fully disclosed at the time the COA was signed or for any other reason set forth in the papers presented to the Court.

**Arbitration against the RACHEL B** *in rem*

The Court would agree that the *in rem* lien claim could be arbitrated against the interests of the present owner, *in rem*, if the vessel had been arrested as Respondent threatened to do in its demand for arbitration, if a letter of undertaking had been furnished by the P&I Club. No explanation is given for the failure to do so.

Both sides cite *Thyssen, Inc. v. Calypso Shipping Corp.,* 310 F.3d 0102 (2d Cir. 2002). *Thyssen* is distinguishable because the shipowner in fact submitted a club letter of undertaking which the Court of Appeals held "replaces the vessel as the *res."* At most, *Thyssen* stands for the principle that where the vessel has been arrested or an undertaking equivalent to an arrest has been given, *in rem* claims against the vessel may be arbitrated. As noted earlier, there is no such arrest or letter of undertaking in this case.

8

See also *Marine Transit Corp. v. Dreyfus*, 284 U.S. 263 (1932). Although the vessel is not a party to the arbitration once it has been arrested, the present owner acting in the interest of the vessel has the right to have the underlying dispute referred to arbitration. This is the unspoken premise of *Marine Transit*, *Thyssen*, and other cases relied upon by Respondent.

Solae also relies in part on *Industrial y Frutera Colombiana S.A.*, 195 F.2d 1015 (5th Cir. 1952) for the proposition that the arbitration of an *in rem* claim against the vessel could be ordered by the Court. The Court in *Industrial y Frutera* held that the party claiming to be aggrieved and seeking a maritime arbitration must begin with the arrest of the vessel and thereafter [the District Court] shall then have jurisdiction to direct the parties to proceed with the arbitration and shall retain jurisdiction to enter its decree upon the award. This case is not informative with respect to the present dispute because, as noted earlier, the Rachel B was never arrested and no letter of undertaking was ever obtained. Similarly, in *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1 (1972), also cited by Respondents, the vessel had been arrested.

This Court need not reach the issue of whether an arrest of the vessel at this time followed by a claim for arbitration would be time-barred as claimed by Petitioners.

Accordingly, Petitioners are entitled to an injunction against *in rem* arbitration against the vessel. The Respondent and the arbitrators and any persons having actual notice of this Court's final judgment in the case are enjoining arbitrating against

9

the Petitioners for the vessel *in rem*.

Should the vessel be arrested, that portion of the injunction may be reconsidered by the Court based on changed facts.

Respondents also claim that Suffolk is or was simply an *alter ego* of Hiltveit. That claim, and any related claims that the corporate veil can be pierced, or that Hiltveit was the owner of Suffolk (if indeed it was) are dismissed without prejudice. Also not before this Court are any claims which may be asserted under the New York Debtor and Creditor Law or otherwise for reason of any fraudulent transfers which may have taken place in the liquidation of Suffolk. There is no information in the record to permit adjudication of those issues and they are at most theoretical, unless and until an arbitration award is rendered against Suffolk, reduced to judgment and remains unpaid.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 65 Fed. R. Civ. P. A formal final judgment may be settled on five days notice or waiver of notice which will enjoin the arbitration to the extent set forth herein.
X

        X

                X

                    X

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
ZAREPTA CHEMICAL, K.S. As Owners
of the M/T RACHEL B and HILTVEIT

                              Petitioners,                     05 CV 8265 (CLB)

        - against -                                            *Memorandum and Order*

SOLAE, LLC,

                              Respondent.
-------------------------------------------------------x

Brieant, J.

      By motion filed in this admiralty case controlled by Federal law, on September 26, 2005, heard and fully submitted on October 6, 2005, Petitioners Zarepta Chemical K.S. ("Zarepta") as current Owner of the M/T RACHEL B (the "Vessel") and Hiltveit Associates ("Hiltveit") collectively ("Petitioners") move pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201; Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"); and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, T.I.A.S. No. 6997, 330 U.N.T.S. (1970), implemented by 9 U.S.C. § 201 et. seq. ("Convention") for a preliminary and final injunction enjoining a maritime arbitration as against them. Respondent, Solae, LLC ("Solae") filed opposition papers to this motion on September 29, 2005. Reply papers were filed on October 6, 2005.

      The following facts were developed at the Rule 65 hearing. This is an action to enjoin arbitration for claims arising from a maritime dispute. Respondent seeks to recover cargo loss and damage incurred as a result of contamination of a bulk cargo of

1

lecithin carried in two separate voyages from Jacksonville to Rotterdam by the M/T Rachel B ("the Vessel"). The sole issue is whether Petitioners are required to arbitrate.

*Parties*

Petitioner Zarepta Chemical K.S. (Zarepta) is a Norwegian business organization which acquired ownership of the Rachel B after the events giving rise to the claims sought to be arbitrated. Petitioner Hiltveit Associates (Hiltveit) is a New York corporation which was the managing agent for Suffolk Tankers Ltd. ("Suffolk"), the former owner of the Rachel B, as well as for Zarepta. It was the signatory of a Contract of Affreightment (COA) discussed below. Suffolk was a one-ship corporation formerly existing under Liberian law, and is not a party to these proceedings.

Respondent Solae LLC (Solae) has its principal office in St. Louis, Missouri, and is the successor in interest to Central Soya Company Inc., ("Central Soya US") and Central Soya European Lecithins GmbH & Co. KG of Hamburg, Germany ("Central Soya Europe"). Central Soya Europe was the consignee of the shipments and Central Soya USA was the shipper and a party to the COA.

After protracted negotiations in early December of 2001, Hiltveit, describing itself as "managing agents to owners" executed the COA for the carriage of Central Soya US's Lecithin cargo from Jacksonville to Rotterdam, calling for three liftings on vessels to be named. The lecithin was to be used in the production of pharmaceutical products.

The COA (Ex. B to the Petition) was dated December 20, 2001. The COA incorporated and attached the standard form of Tanker Voyage Charter Party "ASBATANKVOY". Under the COA, Par. 10, Hiltveit was to nominate a performing vessel for each voyage. Hiltveit as agent for owners was free to nominate any vessel; Central Soya US had the right to confirm or reject a nomination.

> Part II of ASBATANKVOY provides at paragraph 24 in relevant part that:
>
>> Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York. . . pursuant to the laws relating to arbitration there in force"

On or about January 15, 2002, the Rachel B was nominated by Hiltveit to perform the first lifting. Central Soya US accepted this nomination on January 25, 2002. On or about January 29, 2002, the Rachel B arrived at Jacksonville, Florida and lifted the first cargo for carriage under the COA. A clean Bill of Lading was issued on January 29, 2005 stating that the shipment was carried under and pursuant to the terms of the COA dated December 20, 2001. The Vessel discharged the cargo in Rotterdam in March, 2002.

Thereafter, on April 15, 2002, after the first shipment on the Rachel B and another shipment under the COA on a different vessel, Hiltveit nominated the Rachel B for a third voyage. Lecithin was again carried to Rotterdam by the Rachel B, pursuant to a clean Bill of Lading issued on or about May 7, 2002.

The Bills of Lading (Exhibits C and D) were issued to Central Soya US with Central Soya European Lecithins GMBH & Co. (Central Soya Europe) as consignee, and recited that the shipment "is carried under and pursuant to the terms of the COA dated December 20, 2001 at New York, New York between Suffolk Tankers Ltd., with Hiltveit Associates, Inc., as agents to owners, and Central Soya Company."

Respondent claims that the lecithin on each voyage became contaminated with benzene while on board the Rachel B. Because of this contamination, the lecithin became unfit for its intended pharmaceutical purpose and had to be sold at reduced prices. Lost profits and expenses in connection with salvage sales are claimed.

On October 29, 2002 arbitration was demanded by Central Soya US against Suffolk and Hiltveit. Hiltveit and Suffolk jointly appointed an arbitrator in response to the demand. Solae's counsel submitted to the arbitrators a pre-hearing memorandum dated May 25, 2005 identifying Solae as successor in interest and purported to add the Vessel *in rem* to the arbitration. Exhibit E requested a P & I Club Letter of Undertaking "to avoid the complications of arrest, etc." However, no such letter was ever furnished and the Rachel B was never arrested, and no explanation given for failing to have done so.

After a preliminary hearing before the arbitration panel on July 29, 2005, Petitioners' counsel wrote to the arbitration panel stating Hiltveit and the Vessel are not

proper parties to the arbitration and that a Court must decide the issue. Arbitration hearings are presently scheduled with the panel on November 14, 15, and 16, 2005.

This Court has subject matter jurisdiction under 28 U.S.C. § 1331, § 1332, and § 1333. The Petition also involves 9 U.S.C. § 1 et. Seq. and 9 U.S.C. § 206 and the Declaratory Judgment Act, 28 U.S.C. § 2201. The Court has personal jurisdiction over the Respondent.

"Arbitration is a matter of consent, not coercion." *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (*quoting Volt Information Sciences v. Board of Trs.*, 489 U.S. 468, 479 (1989)). A party "cannot be required to submit to arbitration any dispute which he has not agreed to submit." *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-84 (2002) (*quoting Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)).

Notwithstanding the "long recognized 'liberal federal policy favoring arbitration agreements,' *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24-5 (1983), whether the parties have agreed to submit a particular dispute to arbitration, that is, the 'question of arbitrability,' is an issue for judicial determination [u]nless the parties clearly and unmistakable provide otherwise." *AT&T Technologies, Inc. Communications Workers*, 475 U.S. 643, 649 (1986). Under 9 U.S.C. § 4, the proper procedure for a party to challenge whether it is subject to an arbitration agreement is to move the District Court to enjoin arbitration. *Smiga v. Dean Witter Reynolds, Inc.*, 766

F.2d 698 (2d. Cir. 1985). A person against whom an arbitration has been initiated, who has not agreed to arbitrate, directly or by operation of law, is deemed to be irreparably damaged.

> Our Court of Appeals has held:
>
> > First, [the district court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration. *Oldroyd v. Elmira Sav. Bank*, FSB, 134 F.3d 72, 75-76 (2d Cir. 1998).

There is no question that Solae may arbitrate against Suffolk. Counsel do not suggest otherwise and there is no appearance in this action by Suffolk. Solae contends that Suffolk was a one ship corporation which is now a no ship corporation, and presumably defunct and dissolved. It claims that the corporation had no officers, directors, or corporate reality and that it can pierce the corporate veil. This may well be true on the facts presented. However, the Court expresses no opinion as to that. It may well be that an arbitral award leading to an entry of a judgment for money damages against Suffolk returned unsatisfied could result in future litigation against the real parties in interest including Suffolk's principals possibly including Hiltveit. The fact remains that the record here will not support a judicial finding of an agreement on the part of Zarepta or Hiltveit Associates to arbitrate.

*Arbitration against Hiltveit Associates*

From the beginning of the negotiations and in all documents signed by Hiltveit, it was referred to as "managing agent to owners." We assume for our analysis that when the COA was signed in December 2001, the identity of the owners was not known to Solae's predecessors. It was known that an agency existed. However, by the time the bills of lading were issued for the cargos of lecithin claimed to have been damaged, the principal, Suffolk, was fully disclosed. That the owners had the right to substitute a vessel for the RACHEL B, which they never did, does not alter the fact that by the time the RACHEL B and its owners became obligated to perform the contract of carriage, Suffolk was a fully disclosed principal.

An instructive case is *In Re Hidrocarburos y Derivados, C.A. v. Lemos*, 453 F. Supp. 160 (S.D.N.Y., 1977). *Hydrocarburos* involved the obverse situation of this case, in that the charterers sought to compel the owner of the vessels to arbitrate under a contract of affreightment. In that case as here, agents had signed the COA as agents for a partially disclosed principal but the owners whose vessels were used for the actual carriage became disclosed principals at the time of nomination.

Judge Haight held:

> However, once Nereus [the agent] nominated a vessel to load a cargo pursuant to Clause 3 of the COA, her corporate owner became known. While it is generally said that the pertinent knowledge of a principal's existence or identity is that which exists at the time of the transaction so that subsequent 'disclosure' has no bearing upon the relationship created at the time of the transaction, Restatement § 4, Comment c,

> the rule is usually applied to simple contracts (see illustrations to the Comment); in the rather unusual circumstances of the contract at bar,
> I hold that corporate shipowners whose vessels were actually nominated became disclosed principals, to the extent of that particular voyage at the time of nomination."

Judge Haight concluded that the petition to compel arbitration should be granted "as to those corporate shipowners whose vessels performed voyages giving rise to the claims which are pending in arbitration". Relying on *Hydrocarburos,* this Court concludes that Hiltveit Associates may not be compelled to arbitrate for the reason that its principal was not fully disclosed at the time the COA was signed or for any other reason set forth in the papers presented to the Court.

**Arbitration against the RACHEL B *in rem***

The Court would agree that the *in rem* lien claim could be arbitrated against the interests of the present owner, *in rem*, if the vessel had been arrested as Respondent threatened to do in its demand for arbitration, if a letter of undertaking had been furnished by the P&I Club. No explanation is given for the failure to do so.

Both sides cite *Thyssen, Inc. v. Calypso Shipping Corp.,* 310 F.3d 0102 (2d Cir. 2002). *Thyssen* is distinguishable because the shipowner in fact submitted a club letter of undertaking which the Court of Appeals held "replaces the vessel as the *res.*" At most, *Thyssen* stands for the principle that where the vessel has been arrested or an undertaking equivalent to an arrest has been given, *in rem* claims against the vessel may be arbitrated. As noted earlier, there is no such arrest or letter of undertaking in this case.

See also *Marine Transit Corp. v. Dreyfus*, 284 U.S. 263 (1932). Although the vessel is not a party to the arbitration once it has been arrested, the present owner acting in the interest of the vessel has the right to have the underlying dispute referred to arbitration. This is the unspoken premise of *Marine Transit*, *Thyssen*, and other cases relied upon by Respondent.

Solae also relies in part on *Industrial y Frutera Colombiana S.A.*, 195 F.2d 1015 (5th Cir. 1952) for the proposition that the arbitration of an *in rem* claim against the vessel could be ordered by the Court. The Court in *Industrial y Frutera* held that the party claiming to be aggrieved and seeking a maritime arbitration must begin with the arrest of the vessel and thereafter [the District Court] shall then have jurisdiction to direct the parties to proceed with the arbitration and shall retain jurisdiction to enter its decree upon the award. This case is not informative with respect to the present dispute because, as noted earlier, the Rachel B was never arrested and no letter of undertaking was ever obtained. Similarly, in *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), also cited by Respondents, the vessel had been arrested.

This Court need not reach the issue of whether an arrest of the vessel at this time followed by a claim for arbitration would be time-barred as claimed by Petitioners.

Accordingly, Petitioners are entitled to an injunction against *in rem* arbitration against the vessel. The Respondent and the arbitrators and any persons having actual notice of this Court's final judgment in the case are enjoining arbitrating against

the Petitioners for the vessel *in rem*.

Should the vessel be arrested, that portion of the injunction may be reconsidered by the Court based on changed facts.

Respondents also claim that Suffolk is or was simply an *alter ego* of Hiltveit. That claim, and any related claims that the corporate veil can be pierced, or that Hiltveit was the owner of Suffolk (if indeed it was) are dismissed without prejudice. Also not before this Court are any claims which may be asserted under the New York Debtor and Creditor Law or otherwise for reason of any fraudulent transfers which may have taken place in the liquidation of Suffolk. There is no information in the record to permit adjudication of those issues and they are at most theoretical, unless and until an arbitration award is rendered against Suffolk, reduced to judgment and remains unpaid.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 65 Fed. R. Civ. P. A formal final judgment may be settled on five days notice or waiver of notice which will enjoin the arbitration to the extent set forth herein.

X

    X

        X

            X